CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

JUL 09 2020

JULIA C. DUDLEY, CLERK
BY: s/ H. MCDONALD
    DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## DANVILLE DIVISION

| | | |
|---|---|---|
| **NILAY C. PATEL, DO,** | ) | |
| | ) | **Civil Action No. 4:18-cv-00065** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **SOVAH HEALTH DANVILLE, CI,** | ) | **By:   Hon. Michael F. Urbanski** |
| **d/b/a DANVILLE REGIONAL** | ) | **Chief United States District Judge** |
| **MEDICAL CENTER, LLC,** <u>et al.</u>, | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION</u>

This matter comes before the court on Defendants SOVAH Health Danville, CI ("SOVAH"), LifePoint Health, Inc. ("LifePoint"), Danville Physician Practices, LLC ("the Practice"), and HSCGP, LLC's ("HSCGP") motions for summary judgment, ECF Nos. 36 & 61, as well as Plaintiff Dr. Nilay C. Patel's motion to strike/motion for sanctions, ECF No. 45. After a review of the pleadings, arguments of the parties, relevant evidence, and applicable law, the court will grant the motions for summary judgment as to Counts I and II, deny the Practice's motion for summary judgment as to Count III, grant the remaining Defendants' motions for summary judgment as to Count III, and deny Plaintiff's Motion to Strike/Motion for Sanctions. Count II will proceed to trial against the Practice only.

## I.

On a Rule 56 Motion for Summary Judgment, the facts (and all reasonable inferences derived therefrom) are taken in the light most favorable to the non-moving party. Accordingly,

the facts set forth herein are either not contested or recited in the light most favorable to Plaintiff.

Plaintiff is a medical doctor specializing in family medicine and a Navy reservist. SOVAH owns and operates the primary hospital in Danville, Virginia. The Practice manages SOVAH Health Mt. Hermon Clinic ("the Clinic") in Danville, Virginia. LifePoint is the holding company that owns both SOVAH and the Practice. HSCGP is an entity affiliated with LifePoint that provides various services to LifePoint's various hospitals around the country.

In January 2017, Plaintiff began working as a family care physician at the Clinic pursuant to a written employment agreement[1] with the Practice. At the time he was hired, it was known at the Practice that Plaintiff was a Navy reservist and that he would, from time to time, be required to miss work to complete military training and drills. At the time be began his employment, Plaintiff signed an Acknowledgement stating that he read and understood SOVAH's and the Practice's Equal Employment Policy and military leave policy. He also signed a Patient Confidentiality Statement acknowledging his duty, consistent with the Health Insurance Portability and Accountability Act ("HIPAA") and the Practice's policies, to maintain patient confidentiality at all times.

Plaintiff's employment agreement with the Practice provided that he could be terminated "for cause" upon written notice to Plaintiff that he "conduct[ed] himself in a manner . . . [the Practice] determine[d] to be unethical or fraudulent, … detrimental to patient care, … disruptive in any manner that helps create a negative working environment at the

---

[1] Plaintiff worked "PRN" (the Latin "pro re nata," meaning on an as-needed basis) at the Clinic from October 2016 until the official start of his employment on January 1.

Medical Practice or Hospital, or [that] impair[ed] the reputation or operation of [the Practice] . . . ." (Dep. of Nilay Patel Ex. 9 ¶ 4.1(B)(v), Nov. 14, 2019, ECF No. 37-2 pg. 124.) The Practice also had the option to terminate its employment agreement with Plaintiff "without cause," provided it gave Plaintiff 90-days written notice. (Id. Ex. 9 ¶ 4.2.)

During his employment at the Practice, Plaintiff continued in his role as a Navy reservist. As part of that obligation, he was required to attend drills and training that necessitated time away from the Clinic. When ordered by the military to attend drills or training, Plaintiff would inform June Hill, the Clinic's office manager, and Hill would forward those requests for time off to Steven Evans, Assistant Practice Market Manager. When Plaintiff's military orders conflicted with his scheduled workdays, Hill would rework the schedule to ensure adequate provider coverage.[2] If coverage could not be arranged, the Clinic would be closed until an appropriate provider could come in. Plaintiff took military leave in March, May, July, and August 2017. (See id. 81:6–82:9 & Ex. 11, ECF No. 37-2 pgs. 20–21,

When Plaintiff interviewed for the position at the Clinic, he met with Alan Larson, CEO of SOVAH. During that meeting, Plaintiff claims Larson told him:

> You can quit your other obligations. You will be doing so fine here at SOVAH, you won't need to work for anyone else. . . . You will no longer – you don't need to work anywhere else. You will do fine here. Quit your other obligations.

(Id. 119:4–12, ECF No. 44-1 pg. 32.) Additionally, Plaintiff contends the staff at the Clinic gave pushback regarding his unique scheduling arrangements. He asserts Steven Evans told him his military commitments would be "tough on the clinic" and the Clinic would need to

---

[2] Two other medical providers worked at the Clinic: Elizabeth Harris, and nurse practitioner, and Dave Smith, a physician assistant.

close if they could not find coverage during his drills and trainings. (Id. 122:19–23, ECF No. 44-1 pg. 33.) Suezatte Bailey, the front desk representative at the Clinic, agreed that the staff found the scheduling issues associated with Plaintiff's military commitments to be "frustrating." (Dep. of Suezatte Bailey 20:1–14, Dec. 5, 2019, ECF No. 44-8 pg. 20.)

Plaintiff also testified that, on several occasions, June Hill and/or Patricia "Trish" Veneto[3] asked him to "switch" his military drill days. (Patel Dep. 21:10-27:25, ECF No. 44-1 pgs. 7-9.) Both Hill and Evans dispute that testimony, and submitted declarations stating that no such requests were ever made. (See Decl. of June Hill ¶ 12, Nov. 20, 2019, ECF No. 37-4; Decl. of Steven Evans ¶ 17, Dec. 4, 2019, ECF No. 37-3.) Evans asserted that, to his knowledge, "the Practice approved Dr. Patel's military leave requests every time he had to attend drills." (Evans Decl. ¶ 18, ECF No. 37-3.) Plaintiff testified he had to change his drill schedule 8–12 times during his employment at the Practice (Patel Dep. 27:14–25, ECF No. 44-1 pg. 9), but contemporaneous records show he only took leave on four occasions to fulfill his military commitments (id. at 81:16–82:16, ECF No. 37-2 pgs. 21–22). Plaintiff does not dispute the accuracy of those records. (Id. at 81:6–82:25, ECF No. 44-1 pgs. 22–23.)

Timothy Wones, who was Officer in Charge Medical Branch at Camp Lejeune, NC, wrote a letter describing the difficulty Plaintiff had scheduling drills and noted Plaintiff's "absences were detrimental to mission readiness and accomplishment." ECF No. 44-9. Wones was not deposed, and he had no personal knowledge of events at the Practice.

At some point on March 27, 2018, Plaintiff was treating a 16-year-old patient at the Clinic. The child was accompanied by his mother, Patient X, who staff reported was verbally

---

[3] During the relevant time period, Veneto was the Senior Director of the Practice.

abusive and accused Plaintiff and another member of the staff of sleeping together. After they left, Plaintiff contacted Anna Farrar, the office manager, about Patient X's behavior, and requested that she be discharged from the Clinic. Farrar called Patient X and informed her that she had been discharged as a patient.

On April 2, at approximately 9:57 a.m., Patient X returned to the Clinic and asked to speak with Plaintiff. (See Patel Dep. Ex. 33, ECF No. 37-2 pg. 180.) Suezatte Bailey told Patient X that Plaintiff was unavailable. Patient X came back and forth to the Clinic over the course of the next several hours, causing concern among the staff for their safety, with some concerned that she may have been armed. (Id. at 188:22–189:1; 191:12–194:7, ECF No. 44-1 pgs. 49–51.) When she returned to the Clinic a third time, Bailey asked Plaintiff to speak with Patient X. Plaintiff, Fred Smith (a student intern), Vanessa Nelson (a medical assistant), and Bailey were at the front desk when Plaintiff spoke with Patient X. Although there is some evidence to suggest that other patients were in the waiting room, the vast majority of the testimony confirms that no other patients were present.[4]

Patient X asked Plaintiff why she had been discharged from the Clinic, and Plaintiff advised her it was due to her behavior on March 27. Plaintiff told her she could go to other clinics, including the SOVAH clinic in Brosville, Virginia. Patient X advised Plaintiff she could not go to the Brosville location and asked why she had been discharged from the Brosville location. Plaintiff told her to discuss that issue with staff at the Brosville clinic, but Patient X repeatedly demanded an answer from Plaintiff. Plaintiff had a member of his staff look up

---

[4] Admittedly the evidence is in some conflict on this point. Under the applicable standard of review, however, the evidence is recited in the light most favorable to Plaintiff.

Patient X's records (id. 189:2–11) and discovered that she had a positive drug screen. Plaintiff told Patient X what her records said; Smith, Nelson, and Bailey all heard that conversation. Patient X then left the Clinic and did not return again.

On April 10, Anna Farrar informed Plaintiff that Patient X told her she was going to file an official HIPAA complaint. Plaintiff responded to Farrar by e-mail, stating: "[Patient] asked to discuss information, information was not told to her voluntarily." (Id. Ex. 36, ECF No. 37-2 pg. 183.) The Practice asked William Murray, Privacy Officer for SOVAH Health, to investigate Patient X's allegations to determine whether or not Plaintiff's actions violated HIPAA.

On April 18, Chenise Blackwell, a patient advocate with SOVAH, e-mailed Murray and Donna Richardson, another Market Manager, about Patient X's complaint. She reiterated that Patient X claimed Plaintiff told her she had a positive drug screen and that "staff and patients in the waiting area heard this." (Id. Ex. 37, ECF No. 37-2 pg. 184.) Blackwell also stated that Patient X said she called the Brosville clinic and was told she had <u>not</u> been discharged from that clinic as a patient.

On April 19, Veneto e-mailed Murray and others, saying, "We just need to know if we are proceeding with a for cause termination or if we are proceeding with a without cause termination with this provider." ECF No. 44-33.

On April 24, Veneto e-mailed Plaintiff and advised they were still investigating the "HIPAA breach." (Patel Dep. Ex. 38, ECF No. 37-2 pg. 186.) Plaintiff responded that Veneto's e-mail was "the first email [he had] received from [Veneto] regarding this complaint."

He reiterated that "[t]he information discussed with [Patient X] was on her repeatedly demanding an answer." (Id.)

On April 25, Veneto e-mailed Murray: "I have spoken with legal and we are proceeding with termination. Did anyone ever reach out to Dr[.] Patel to get his side of the story? I am sure he will bring that up when we present the termination to him." ECF No. 44-35. She followed up that e-mail, specifically pointing out that she told Plaintiff "the matter was still under investigation . . . ." Id.

On April 26, Murray and Plaintiff discussed the incident with Patient X. On April 27, Murray memorialized his investigation in a brief memo, noting that "Dr. Patel admitted that he did engaged [*sic*] in an argument with patient, and during argument, he disclosed patient drug history." (Patel Dep. Ex. 39, ECF No. 37-2 pg. 187.)

The Practice[5] terminated Plaintiff on April 30. According to Veneto, after reviewing the evidence and discussing the matter with Larson and Alan Douglas, Group Senior Director for Physician Practice Management, she determined that Plaintiff had violated HIPAA and terminated Plaintiff's employment pursuant to the "for cause" section of his contract. (Decl. of Alan Douglas ¶¶ 12–14, Dec. 5, 2019, ECF No. 37-1; Dep. of Patricia Veneto 18:11–13, Dec. 3, 2019, ECF No. 44-24.)

Plaintiff contacted Murray the next day and complained about the "for cause" determination. According to Murray, during their conversation, Plaintiff again "confirmed"

---

[5] Plaintiff's termination letter was signed by Mark Pickett, Vice President, Physician Services. (Patel Dep. Ex. 40, ECF No. 37-2 pg. 188.)

he disclosed patient information, but felt that his termination was "not professional." (Patel Dep. Ex. 41, ECF No. 37-2 pg. 189.)

On November 27, 2018, Plaintiff filed suit in this court. ECF No. 1. Plaintiff filed an amended complaint, ECF No. 3, and SOVAH, LifePoint, and the Practice filed a motion for summary judgment on December 6, 2019, ECF No. 36. Plaintiff moved for leave to file a seconded amended complaint which named a new defendant—HSCGP, LLC—and abandoned several claims. ECF No. 43. That request was granted, ECF No. 58, and all defendants joined in a motion for summary judgment on March 26, 2020, ECF No. 61.

On December 20, 2019, Plaintiff also filed a motion strike and motion for sanctions in response to the motion for summary judgment filed by SOVAH, LifePoint, and the Practice. ECF No. 61. On March 26, 2020, he filed a motion for leave to file a supplemental brief in opposition to the defendants' motion for summary judgment. ECF No. 62.

On April 27, 2020, the court held a hearing on the pending motions, and the matter is now ripe for disposition.

## II.

Pursuant to Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" McAirlaids, Inc. v. Kimberly-Clark Corp., 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (quoting Tolan v. Cotton, 572 U.S. 650, 651 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson, 477 U.S. at 255. The non-moving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at 252). The non-moving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249). "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." Perini Corp. v. Perini Constr.,

Inc., 915 F.2d 121, 124 (4th Cir. 1990) (citing Anderson, 477 U.S. at 248). Even when facts are not in dispute, the court cannot grant summary judgment unless there is "no genuine issue as to the inferences to be drawn from" those facts. World-Wide Rights Ltd. P'ship v. Combe, Inc., 955 F.2d 242, 244 (4th Cir. 1992).

## III.

### a.  Count I: USERRA

The Uniformed Services Employment and Reemployment Rights Act ("USERRA") "prohibits discrimination in employment on the basis of military service." Sheehan v. Dep't of Navy, 240 F.3d 1009, 1012 (Fed. Cir. 2001). Its primary operative provision states, "A person who is a member of . . . or has an obligation to perform service in a uniformed service shall not be denied . . . retention in employment . . . by an employer on the basis of that membership . . . , performance of service, . . . or obligation." 38 U.S.C. § 4311(a). An employer violates USERRA "if the person's membership . . . or obligation for service in the uniformed services is a motivating factor in the employer's [adverse employment] action, unless the employer can prove that the action would have been taken in the absence of such membership . . . or obligation for service." Id. § 4311(c). Liability under USERRA lies "when a person's military service is a 'motivating factor' in the discriminatory action, even if not the sole factor." Sheehan, 240 F.3d at 1013 (citing 38 U.S.C. § 4311(c)(1)).

"The procedures established by precedent require an employee making a USERRA claim . . . to bear the initial burden of showing by a preponderance of the evidence that the employee's military service was 'a substantial or motivating factor' in the adverse employment action." Id. (citing Nat'l Labor Relations Bd. v. Transp. Mgmt. Corp., 462 U.S. 393, 400–01

(1983)). A "motivating factor" is one that "a truthful employer would list if asked for the reasons for its decision." Brandsasse v. City of Suffolk, Va., 72 F. Supp. 2d 608, 617 (E.D. Va. 1999) If the employee is able to meet that requirement, the burden shifts to the employer to show, by a preponderance of the evidence, that it would have taken the same action for a valid, nondiscriminatory reason. See Sheehan, 240 F.3d at 1013 (collecting cases).

At the outset, Plaintiff lacks any direct evidence of discrimination, and thus must proceed on circumstantial evidence.

> Discriminatory motive under the USERRA may be reasonably inferred from a variety of factors, including proximity in time between the employee's military activity and the adverse employment action, inconsistencies between the proffered reason and other actions of the employer, an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses.

Hill v. Michelin N. Am. Inc., 252 F.3d 307, 314 (4th Cir. 2001) (citing Shaheen, 240 F.3d at 1014). None of these factors support Plaintiff's claim.

Primarily, a span of nearly eight months elapsed between Plaintiff's last military activity and his termination. Such a long period of time strongly undercuts any inference of discriminatory animus in the Practice's decision. To borrow a phrase from another discrimination case, "[a] lengthy time lapse between" Plaintiff's last military activity "and the alleged adverse employment action, as was the case here, negates any inference that a causal connection exists between the two." Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998). Additionally, Plaintiff has not pointed to any inconsistencies

in the proffered reasons and other actions of his employer or employers,[6] any expressed hostility to members of any military branch or service—including himself—or disparate treatment of employees with similar offenses.[7]

Plaintiff points to various comments from other employees as evidence of an unlawful animus against him on account of his military service. This evidence, however, is insufficient to carry his initial burden. First and foremost, the comments have no relation to his military service. Rather, the worst that can be said of them is they relate to the inconveniences of scheduling around Plaintiff's commitments. While USERRA outlaws discrimination on the basis of one's military service, it does not require that an employer never mention an employee's service commitments. Plaintiff's interpretation of USERRA would grossly expand its reach to include even the acknowledgement that employing individuals with active service commitments may, on occasion, create a hardship for the employer. There is no doubt that is true and USERRA requires employers to shoulder that burden and not punish the service member for it, but it does not render unlawful its mere acknowledgment.

Even if the comments alleged did suggest animus, Plaintiff has failed to offer evidence that any defendant "relied on, took into account, considered, or conditioned its decision" on Plaintiff's military status. Chance v. Dallas Cnty. Hosp. Dist., No. 3-96-CV-2842-BD, 1998

---

[6] Plaintiff contends he was jointly employed by several entities, but his evidence is lacking as to any of them. That being the case, this court need not investigate the merits of Plaintiff's joint employment claim. Because his evidence fails as to all the defendants, it does not matter which one (or ones) employed him.

[7] In his supplemental brief, Plaintiff points to several other employees who disclosed private health information but were not terminated. While this evidence is concerning, see ECF No. 62-2, Plaintiff has failed to establish the relevance of these other incidents. There is no evidence Veneto or Douglas (the decisionmakers accused of discriminatory animus here) were involved in the investigation or resolution of those complaints, and nothing suggests the individuals described therein were employed by the Practice.

WL 177963, at *3 (N.D. Tex. Apr. 6, 1998). Plaintiff alleges both June Hill and Steven Evans made comments about his military service, but it was Veneto and Douglas who made the decision to terminate him. There is no evidence to suggest that Veneto or Douglas ever made any comments about Plaintiff's military service, and no evidence that they heard—let alone considered or condoned—any allegedly discriminatory statements by Hill or Evans. See Sanguinetti v. United Parcel Serv., Inc., 114 F. Supp. 2d 1313, 1318 (S.D. Fl. 2000) (granting summary judgment and noting that an individual who made comments about the plaintiff's military service "was not involved in the termination decision" and the plaintiff had consequently failed to show "that his military obligations factored into . . . [the] decision to release him"). Absent evidence that the decisionmakers considered Plaintiff's military service when deciding to terminate his employment, Plaintiff cannot succeed on his USERRA claim, and summary judgment must be granted.

Plaintiff also focuses on the alleged inadequacies in Murray's investigation. Even granting that the investigation was flawed or—at worst—a sham, Plaintiff's argument still lacks a fundamental element of proof. It is not enough to say that the termination decision was a foregone conclusion; in fact, some evidence suggests that it was.[8] Rather, to succeed on his USERRA claim, Plaintiff must show it was a foregone conclusion because of his military status. Only if he succeeds in that showing is the court permitted to examine the Practice's proffered rationale for his termination. For the reasons stated above, Plaintiff has failed to

---

[8] For example, prior to Plaintiff's encounter with Patient X, at least one staff member was told that, if she had any complaints about Plaintiff, she should voice them at that time. (See Bailey Dep. 42:11–19, ECF No. 44-8 pg. 42.) This evidence, taken in the light most favorable to Plaintiff, suggests that the desire (and possibly even decision) to terminate Plaintiff occurred prior to the alleged HIPAA violation, meaning the Practice's stated reason for terminating him was untrue. While not relevant on Plaintiff's USERRA claim, it does come into play on his breach of contract claim. See infra § III.c.

offer evidence that Veneto or Douglas "relied on, took into account, considered, or conditioned its decision" on Plaintiff's military status, <u>Chance</u>, 1998 WL 177963, at *3, and thus his claim fails as a matter of law, regardless of whether Murray's investigation was inadequate or insufficient.

      b.  <u>Count II: Defamation and Defamation per se</u>

In order to prevail on his defamation claim, Plaintiff must show that a statement by Defendants was "both false and defamatory." <u>Tharpe v. Saunders</u>, 285 Va. 476, 481, 737 S.E.2d 890, 892 (2013). Additionally, the elements of defamation must be met: "(1) publication of (2) an actionable statement with (3) the requisite intent." <u>Jordan v. Kollman</u>, 269 Va. 569, 575, 612 S.E.2d 203, 206 (2005). "Defamatory words that cause prejudice to a person in [his] profession are actionable as defamation *per se.*" <u>Hyland v. Raytheon Tech. Serv. Co.</u>, 277 Va. 40, 46, 670 S.E.2d 746, 750 (2009).

Plaintiff contends that an email William Murray accidentally sent to the administrator of a LifePoint hospital[9] in North Carolina—the state where he resides—was defamatory *per se.* It was not. This conclusion is apparent by reading the e-mail in question:

> Team,
>
> I returned Dr. Patel call at 5:52 pm, he demonstrated restraint, and expressed frustration with the "with cause" termination. I did discussed his admission of PHI disclosure. He confirmed, and replied he felt like the termination was not professional. I was compassionate and listened to him.
>
> We discussed the incident reporting to Department of Health and Human Services, and I informed him it is reported under SOVAH Health and not under Dr. Nilay Patel. I also informed

---

[9] The administrator had a name similar to a LifePoint employee involved in the issue with Plaintiff and Patient X.

we do not automatically report to AMA or Board of Medicine. I
conveyed, we do not have control over what the patient could
report or to whom.

He expressed a willingness to part on better terms, I informed
him this was not a decision I could address, and I wished him the
best.

(ECF No. 44-61 [*sic* throughout].)

At most, Plaintiff contends the first paragraph is defamatory, but nothing in that
paragraph is "false." At most, it relays the facts as they occurred. Plaintiff <u>was</u> terminated "for
cause." The fact that he disagrees with that determination does not make the statement that
he and Murray discussed his termination "false." Likewise, he <u>did</u> admit to disclosing PHI; he
admitted that in his deposition. (<u>See, e.g.</u>, Patel Dep. 216:1–221:18 [ECF No. 44-1, pgs. 56–
57].) Plaintiff disagrees that the disclosure of the PHI constituted a HIPAA violation, but
Murray's e-mail does not say that his disclosure was a HIPAA violation. It only says that he
admitted to "PHI disclosure," and that statement is uncontroverted. At most, the e-mail may
have lacked the context Plaintiff would have liked, but nothing in it is "false." Absent a "false"
statement, an action for defamation will not lie, and Defendants[10] are entitled to summary
judgment on this count as well.

c.   <u>Count III: Breach of Contract</u>

The elements of a breach of contract are well-settled. There must be "(a) a legally
enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of
that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation."

---

[10] Although not relevant as there is no false statement in the e-mail, Plaintiff made no effort whatsoever to tie
the alleged tort of defamation by Murray (the author of the e-mail) to any named Defendant.

Ulloa v. QSP, Inc., 271 Va. 72, 79, 624 S.E.2d 43, 48 (2006) (quoting Filak v. George, 267 Va. 612, 619, 594 S.E.2d 610, 614 (2004)). There is no dispute that the employment agreement between Plaintiff and the Practice is a valid contract, and no argument that, if the Practice breached the contract, that breach injured Plaintiff. The only question, then, is whether the Practice breached the agreement. In his brief, Plaintiff contends that the Practice breached the implied covenant of good faith and fair dealing in the manner it went about investigating Patient X's complaint, and he alleges that the decision to terminate him was a foregone conclusion, the investigation and "for cause" termination were shams, and the real reason for his termination was his military status and history of making complaints about patient care and safety.

"In Virginia, every contract contains an implied covenant of good faith and fair dealing," Enmoto v. Space Adventures, LLC, 624 F. Supp. 2d 443, 450 (E.D. Va. 2009), which is breached when a party to the contract "exercise[s] contractual discretion in bad faith." Va. Vermiculite, Ltd. v. W.R. Grace & Co., 156 F.3d 535, 542 (4th Cir. 1998). Virginia law, however, "'does not recognize a cause of action for breach of an implied covenant of good faith and fair dealing in employment contracts . . . .'" Chapman v. Asbury Auto. Group, Inc., No. 3:15cv679, 2017 WL 3324486, at *5 (E.D. Va. Aug. 3, 2017) (quoting Devnew v. Brown & Brown, Inc., 396 F. Supp. 2d, 665, 671 (E.D. Va. 2005)). See also Nisbett v. Reconart, Inc., No. 1:16cv1467, 2017 WL 1745045, at *5 (E.D. Va. May 3, 2017) ("[N]either party can cite to a single case that has found the duty of good faith and fair dealing in any employment context."); Bridgeforth v. Potter, No. 3:10cv00030, 2011 WL 3102422, at *12 (W.D. Va. July 25, 2011) ("[T]his is a question of Virginia substantive law, which is 'decidedly straightforward

on this matter: the Commonwealth does not recognize a cause of action for breach of an implied covenant of good faith and fair dealing in employment contracts . . . ." (quoting Devnew, 396 F. Supp. 2d at 671)); Firebaugh v. General Elec. Co., Civ. A. No. 85-0763, 1987 WL 109073, at *3 (W.D. Va. Mar. 11, 1987) ("Plaintiff also asserts that defendant's actions amount to breach of an implied covenant of good faith and fair dealing. This assertion must be rejected because Virginia law does not recognize that implied covenant." (citing Bowman v. State Bank of Keysville, 331 S.E.2d 797 (Va. 1985)). Insofar as Plaintiff is alleging a breach of the implied covenant of good faith and fair dealing in his employment agreement with the Practice, that claim is not recognized in Virginia and cannot form the basis of his breach of contract claim.

That does not, however, end the inquiry. The evidence, taken in the light most favorable to Plaintiff, suggests the alleged HIPAA violation was not the reason—or at least not the sole one—for Plaintiff's termination. As Suezatte Bailey testified:

> Q:    Okay. Did he [Plaintiff] ever share with you that he was being investigated?
>
> A:    Well, I knew that.
>
> Q:    You did?
>
> A:    Yes.
>
> Q:    And how did you know that he was being investigated?
>
> A:    You know how you know things, but I knew that Donna Richardson and – there was another manager there, which both of them are not there anymore, they – they had said, if you have any issues with this provider, you know, they were there, you know, and I had no issues with him. You know, I didn't stay for the meeting; I just left, you know.

Q:      And what was that meeting like?

A:      I didn't stay.

Q:      Okay.

A:      So I don't even know what was said or what was discussed.

Q:      Okay, but you were told that there was a meeting where you could bring up issues?

A:      No, it wasn't a meeting; it was just that they came around saying, when you are switching shifts, if you all have any problem with Dr. Patel, now is the time to say something like that, and I just thought that wasn't good and I just left.

Q:      I got you. When did – when did that happen – did that happen after the incident with the patient?

A:      No, that was before.
. . .
Q:      Okay. Did anybody ever say to you that they were looking to – that they were looking to get rid of Dr. Patel?

A:      I just – you hear the gossip, but – you know, but you hear gossip every day, you know, but . . .

Q:      Did you hear gossip like that, though?

A:      Mmm-hmm.

Q:      You did?

A:      Yes.

Q:      And that was before the incident with the patient?

A:      Mmm-hmm.

Q:      And is that also a yes?

A:      Yes.

- 18 -

(See Bailey Dep. 41:14–43:20, ECF No. 44-8 pg. 42.) While the court places no merit on unadorned evidence of "gossip," it is relevant that, prior to his encounter with Patient X, decisionmakers at the Practice were encouraging employees to state any "issues" they had with Plaintiff. Taking that testimony into account, Plaintiff's evidence shows that, at a minimum, other considerations were at play when the time came to terminate him. If the HIPAA violation was not the true basis for his termination, then there exists a question as to whether or not the Practice breached his employment agreement by terminating him for cause.

Moreover, there is evidence that the decision to terminate Plaintiff was made before Murray's investigation was concluded, suggesting that the alleged HIPAA violation was not the Practice's reason for terminating Plaintiff. On April 19, 2018, prior to the conclusion of Murray's investigation, Trish Veneto[11] e-mailed Murray and others, saying, "We just need to know if we are proceeding with a for cause termination or if we are proceeding with a without cause termination with this provider." (ECF No. 44-33.) On April 25, she e-mailed Murray: "I have spoken with legal and we are proceeding with termination. Did anyone ever reach out to Dr[.] Patel to get his side of the story? I am sure he will bring that up when we present the termination to him." (ECF No. 44-35.) She followed up that e-mail, specifically pointing out that she told Plaintiff "the matter was still under investigation . . . ." (Id.) In her own words, Veneto stated that, although the matter was still under investigation, Plaintiff would be terminated; the only question was whether the termination would be "for cause" or not. This testimony, coupled with Bailey's testimony, suggests the Practice was planning to terminate Plaintiff without regard to whether he violated HIPPA during his encounter with Patient X.

---

[11] Veneto and Douglas made the decision to terminate Plaintiff. (Douglas Decl. ¶ 12–14, ECF No. 37-1 pg. 2.)

At this point, a disputed issue of material fact exists as to the motivation for the Practice's decision to terminate Plaintiff and whether that motivation justified a "for cause" termination.

In his Complaint, Plaintiff alleges he was terminated for his military status (for which he has no evidence, as discussed infra § III.a) and his history of complaints about patient safety. While the evidence is lacking as to his discrimination allegation, there is evidence from which a jury could infer that Plaintiff's history of complaints was the reason he was fired. For example, although his termination came nearly eight months after his last military obligation, Plaintiff made at least nine documented complaints during the two months before his termination:

- Feb. 12, 2018: Plaintiff complained to Veneto and others that Clinic staff did not have time to complete workers' compensation papers
- Feb. 15, 2018: Plaintiff met with Veneto and others to discuss concerns he had about how the Clinic should operate
- March 12, 2018: Plaintiff made various administrative related suggestions for the Clinic to Veneto and others
- March 14, 2018: Plaintiff aired a concern with Veneto and Farrar about a patient he referred to the Hospital
- March 31, 2018: Plaintiff complained to Farrar about FMLA and insurance forms that he felt nurses, not providers, should be completing
- April 10, 2018: Plaintiff asked Farrar about changing Clinic policy so as not to schedule appointments after 4:30
- April 13, 2018: Plaintiff complained to Veneto and others about providers completing FMLA and other paperwork
- April 24, 2018: Plaintiff complained to Farrar about someone at the Clinic mischaracterizing a patient's visit, which would have resulted in Medicare not paying for the visit

(See generally Patel Dep. Exs. 21–30 [ECF No. 37-2, pgs. 167–178].) Plaintiff was officially terminated on April 30.

The Practice counters that, under the terms of the agreement with Plaintiff, it was empowered to make the determination as to whether or not Plaintiff's actions were unethical, fraudulent, detrimental to patient care, disruptive to the Practice, or impaired the Practice's reputation:

> The Agreement may be terminated prior to its expiration, at the election of Employer, under . . . the following circumstances: . . . Physician conducts himself in a manner <u>in which Employer determines</u> to be unethical or fraudulent, is detrimental to patient care, is disruptive in any manner that helps create a negative working environment at the Medical Practice or Hospital, or impairs the reputation or operations of Employer   . . . .

(Patel Dep. Ex. 9 ¶ 4.1(B)(v), ECF No. 37-2 pg. 124 [emphasis added].) Essentially, the Practice argues the employment contract immunizes it against a charge of breach so long as the Practice asserts that it made a decision under ¶ 4.1(B)(v). Even assuming that reading of the employment contract is proper, it does not resolve the issue raised by the evidence. Taking the testimony in the light most favorable to Plaintiff, Veneto made the decision to terminate Plaintiff <u>before</u> a decision was made on his alleged HIPAA violation. Should the trier of fact determine that the HIPAA violation did not motivate the termination, the discretion afforded the Practice under ¶ 4.1(B)(v) falls away.

It is certainly true that, if the Practice wanted to terminate Plaintiff and he <u>then</u> violated his employment contract before he was terminated, the Practice would be entitled to terminate him for cause even if it planned to terminate him without cause prior to the offending incident. Whether that is what occurred here, or whether Plaintiff was terminated for another reason and the Practice used a HIPAA complaint to shield it from its financial obligations under a

"without cause" termination, is a debated question of fact; it is the province of the jury to determine which of those two scenarios is true.

Because there is evidence that a decision to terminate Plaintiff was in the works before his alleged HIPAA violation, and because there is evidence that Veneto decided to terminate Plaintiff prior to reaching a conclusion on whether Plaintiff's actions violated HIPAA, the Practice is not entitled to summary judgment on Plaintiff's breach of contract claim. Because only the Practice was obligated under the contract, all other Defendants are entitled to summary judgment on Count III.

## IV.

Defendants relied on the declarations of several witnesses in support of their motions for summary judgment including: Vanessa Nelson (declaration dated August 24, 2018); June Hill (declaration dated November 20, 2019); William Murray (declaration dated December 3, 2019); and Alan Douglas (declaration dated December 5, 2019). Plaintiff moved to strike these four declarations, contending that they were executed <u>before</u> the respective witnesses were deposed but were not turned over to Plaintiff prior to their depositions. At oral argument, Plaintiff's counsel conceded they received Nelson's declaration in August 2018, despite asserting in their pleading the declaration was never disclosed.

According to Fed. R. Civ. P. 37(c)(1), if a party fails to provide information as required under Fed. R. Civ. P. 26(a) or (e), "the party is not allowed to use the information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or harmless." Defendants admit they failed to turn over three of the four declarations prior to

the depositions of the declarants and concede those declarations should have been disclosed. At issue is whether that failure was substantially justified or harmless.

The Fourth Circuit has identified five factors to aid district courts in determining if a failure to disclose or supplement under Rule 37(c)(1) is substantially justified or harmless:

> (1) [T]he surprise to the party against whom the document was produced;
> (2) the ability of the party to cure that surprise;
> (3) the extent to which allowing the use of the document would disrupt the trial;
> (4) the explanation for the party's failure to disclose the document before trial; and
> (5) the importance of the document.

S. States Rack & Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 596 (4th Cir. 2003) (quoting Rambus, Inc. v. Infineon Tech. AG, 145 F. Supp. 2d 721, (E.D. Va. 2001)).

Addressing the factors in turn, while Plaintiff was justifiably surprised to learn he did not receive the declarations before the depositions, he should not have been surprised Defendants were compelled to rely on declarations to support their motion for summary judgment. For a number of reasons, depositions of the key witnesses were scheduled shortly before the due date for  Defendants' motions for summary judgment. While there is no doubt that extant declarations should have been turned over prior to the depositions of the declarants, the problem was a bit of Plaintiff's own creation as the depositions of Defendants' declarants were not taken until immediately before the summary judgment filing deadline.

Second, insofar as there was a delay in disclosure, the three declarations were included with the motions for summary judgment and turned over to Plaintiff when those motions were filed, even if such disclosure did not technically flow through the discovery process. Defendants' motion for summary judgment was filed on December 6; Hill's declaration was

- 23 -

dated a little more than two weeks prior, Murray's was dated three days prior, and Douglas's was dated the day before.  As evidence that any surprise was cured, Plaintiff made no effort to reopen the depositions of the four witnesses (discovery did not close until December 13). Rather, <u>after</u> the close of discovery, the defendants filed the present motion to strike. If there was actual surprise or prejudice, Plaintiff should have moved more expeditiously to raise the issue with the court. Instead, he waited until after discovery had closed, limiting the recourse available to cure the surprise he now claims.

Third, there is no serious contention use of these documents will disrupt the trial. All the witnesses who submitted declarations were also deposed, and insofar as Plaintiff believes there is a discrepancy between the declarations and the deposition testimony, he will be permitted to explore that on cross-examination of the three witnesses.

Fourth, the defendants have not offered a compelling or acceptable reason for the failure to disclose the declarations as required. This factor weighs in favor of striking the evidence.

Finally, the importance of the declarations is minimal. While Plaintiff contends the declarations are somewhat at odds with the deposition testimony, the court's review does not reveal any glaring discrepancies. Moreover, the court has not relied on the declarations for any matter where deposition testimony on the same topic from the same witness is available.

While the failure to turn over the depositions was not substantially justified, the failure was harmless. Plaintiff's motion to strike and motion for sanctions will be denied.

**V.**

- 24 -

For the foregoing reasons, SOVAH, LifePoint, and HSCGP are entitled to summary judgment on all counts. The Practice entitled to summary judgment on Counts I and II, but not Count III. Therefore, this matter will proceed to trial against the Practice on the breach of contract claim only. An appropriate Order will be entered.

Entered:   July 9, 2020

Mike Urbanski
cn=Mike Urbanski, o=US Courts,
ou=Western District of Virginia,
email=mikeu@vawd.uscourts.gov, c=US
2020.07.09 11:15:12 -04'00'

Hon. Michael F. Urbanski
Chief United States District Judge